# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

WILLIAM C. FROEMMING,

                    Plaintiff,

v.

CITY OF WEST ALLIS, PATRICK MITCHELL, SGT. WAYNE TREEP, LETE CARLSON, and RYAN STUETTGEN,

                    Defendants.

Case No. 19-CV-996-JPS

**ORDER**

On July 12, 2019, William C. Froemming ("Froemming") filed a pro se complaint alleging violations of his constitutional rights by the City of West Allis, Wisconsin ("West Allis"), West Allis Chief of Police Patrick Mitchell ("Chief Mitchell"), Sergeant Wayne Treep ("Sgt. Treep"), Officer Lete Carlson ("Officer Carlson"), and Officer Ryan Stuettgen ("Officer Stuettgen") (collectively, "Defendants"). (Docket #1). On June 5, 2020, Defendants filed a motion for summary judgment, which is now fully briefed. (Docket #17). For the reasons explained below, the Court will grant, in part, and deny, in part, Defendants' motion.

## 1. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A court must construe all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). A court must not weigh the evidence presented or determine the credibility of witnesses; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). The party opposing summary judgment "need not match the movant witness for witness, nor persuade the court that [his] case is convincing, [he] need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

**2.     RELEVANT FACTS**

Froemming, a resident of Hawaii, visited his mother in West Allis in July 2016. (Docket #20-1 at 1). After Froemming left his mother's home late at night on July 13, Officer Carlson, a West Allis police officer, found him asleep in the driver seat of a vehicle parked on the side of the road in West Allis at around 3:00 AM on July 14. (*Id.*) The vehicle's headlights and taillights were on when Officer Carlson first observed it (though Froemming denies that the engine was running). (*Id.* at 4).

At around 3:10 AM, Officer Carlson pulled her police vehicle behind Froemming, activated her emergency lights, as well as her squad camera and body-worn microphone, and approached Froemming's vehicle. (*Id.* at 5). She went directly to the driver-side window of the vehicle, looked inside,

and radioed that the car was a rental. (Defendants' Exhibit 1).[1] She then knocked multiple times on the window and repeatedly ordered Froemming to roll down his window. (*Id.*) Eventually, after rolling down the window approximately two inches,[2] Froemming began talking, and Officer Carlson asked him to roll his window down further. (*Id.*) Froemming responded by asking Officer Carlson if she could hear him. (*Id.*) Officer Carlson said that she could hear him, and she began explaining that she drove by Froemming and noticed him asleep in the vehicle. (*Id.*)

Officer Carlson questioned Froemming as to how he arrived at the scene. (*Id.* at 7). Froemming initially stated that he was coming from his mother's house near the intersection of 86th Street and Lincoln Avenue. (*Id.*) Officer Carlson asked him if he knew where he was parked and how long he had been there. (*Id.*) Froemming did not know how long he had been parked at the location, and, when Officer Carlson again asked him where he had come from, he told her he had been at a friend's house near 48th Street and Oklahoma Avenue. (*Id.* at 8). Froemming told her that he was "just cruising" around. (*Id.*)

Officer Carlson asked Froemming for his identification, and he refused, claiming that he was not driving so she could not "stop" him. (*Id.*) She asked several more times for his identification, and he refused each time, arguing that he cannot be "stopped" while parked, as he was not driving or operating the vehicle. (*Id.*) Officer Carlson explained that she stopped him because he was slumped over, did not know where he was or

---

[1] Defendants' Exhibit 1 is a video of the incident, available on a USB flash drive submitted to the Court.

[2] Froemming asserts that he turned the vehicle on at this time in order to roll down the window. (Docket #20-1 at 6–7).

Case 2:19-cv-00996-JPS   Filed 02/05/21   Page 3 of 29   Document 22

where he came from, and was refusing to identify himself, and because she could smell the odor of alcohol emanating from the vehicle. (*Id.* at 9). Froemming continued to argue over whether he could be "stopped" in a parked vehicle. (*Id.* at 10).

Officer Carlson requested over her radio that a supervisor come to the scene and informed Froemming of such. (*Id.* at 11). Soon, Sgt. Treep arrived on scene and ordered Officer Carlson to move her squad car closer to Froemming's vehicle. (*Id.*) While Officer Carlson was moving her vehicle, Sgt. Treep began talking with Froemming. (Defendants' Exhibit 1). It is unclear what they discussed, as only Officer Carlson's equipment was recording the audio of the event. (Docket #20-1 at 13–14). At this point, several other officers, including Officer Stuettgen, had arrived.

When Officer Carlson returned back to Froemming's vehicle, Sgt. Treep could be heard telling Froemming that the officers intervened because Froemming was passed out in his car and his eyes were glassy and bloodshot. (*Id.* at 14). Froemming refused to exit the vehicle. (*Id.*) Sgt. Treep told him that the officers would punch out the window if he refused to comply. (*Id.*) He asked Froemming "one last time" to open the vehicle, and, when Froemming failed to do so, the officers punched out the passenger-side window. (*Id.* at 15–16). They then unlocked the car doors and opened the driver-side door. (*Id.* at 16). The officers advised each other to watch out for Froemming's seatbelt. (*Id.*)

Sgt. Treep and Officer Carlson directed Froemming to exit the vehicle more than once. (*Id.* at 17). Froemming made no movement to exit, and Sgt. Treep advised that officers would drag him from the vehicle if he did not exit willingly. (*Id.*) Multiple officers then forcibly removed Froemming and shouted at him to "get on the ground." (*Id.* at 18);

Case 2:19-cv-00996-JPS   Filed 02/05/21   Page 4 of 29   Document 22

(Defendants' Exhibit 1). Once Froemming was handcuffed, officers searched his person and stood him up on his feet. (Docket #20-1 at 18). During the search, officers found marijuana in Froemming's pocket and later found a suspected marijuana pipe inside the vehicle.[3] (*Id.*)

The officers took Froemming to the West Allis Police Department and subsequently released him into his mother's custody. (*Id.* at 19). Later, Froemming acknowledged that he had consumed alcohol on July 13, 2016 prior to driving. (*Id.* at 21). He was issued municipal citations for the following offenses: (1) operating while intoxicated; (2) resisting an officer; (3) possession of drug paraphernalia; and (4) possession of THC. (*Id.* at 22–23). The case went to trial at the municipal trial court, and Froemming was convicted on all four violations, as well as for refusing to comply with alcohol testing. (*Id.*) Froemming appealed his convictions in Milwaukee County case numbers 2017TR15728 and 2017TR15729. (*Id.* at 23). The city moved to dismiss case 2017TR15729, and such dismissal was granted. (*Id.* at 26). Froemming appealed both of the aforementioned cases to the Wisconsin Court of Appeals, and that court refused to hear them because case 2017TR15729 had been dismissed and the Circuit Court had issued no formal order in case 20l7TR15728. (*Id.* at 27). Froemming sought no further action in the state court. In July 2019, he brought the present § 1983 civil rights action in this Court. Defendants now move for summary judgment.

3.  **ANALYSIS**

Froemming alleges that the Defendants violated his constitutional rights by: (1) unlawfully detaining him in violation of the Fourth

---

[3]The municipal court found Froemming guilty of possession of drug paraphernalia and THC. (Docket #17-10 at 5, 7). Those findings remain unreversed.

Case 2:19-cv-00996-JPS   Filed 02/05/21   Page 5 of 29   Document 22

Amendment; (2) unlawfully arresting him in violation of the Fourth Amendment; (3) using excessive force in violation of the Fourth and Fourteenth Amendments; (4) engaging in malicious prosecution; (5) retaliating against him in violation of the First Amendment; and (6) maintaining training policies, procedures, and practices with deliberate indifference to constitutional rights. In order to prevail on a § 1983 claim, a plaintiff must show that the defendants (1) deprived him of a federal constitutional right (2) while acting under color of state law. *Reed v. City of Chicago*, 77 F.3d 1049, 1051 (7th Cir. 1996). It is undisputed that Defendants acted under color of state law. Therefore, the Court will turn to the issue of whether Defendants deprived Froemming of his constitutional rights.

### 3.1 Unlawful Detention in Violation of the Fourth Amendment

Froemming complains that he was unlawfully detained by Officer Carlson in violation of the Fourth Amendment when she pulled her police vehicle behind him and activated the emergency lights. Defendants argue that Officer Carlson acted reasonably in her initial interaction with Froemming under the community caretaking doctrine and, therefore, is protected by qualified immunity. The Court agrees with Defendants and will grant them summary judgment on this claim.

The Fourth Amendment protects "against unreasonable searches and seizures." *Cady v. Dombrowski*, 413 U.S. 433, 439 (1973) (quoting U.S. Const. amend. IV). Generally, a search or seizure is "unreasonable" where the police do not have probable cause that a crime was committed. *Id.* But there are various exceptions to the probable-cause requirement—one of which is the "community caretaking" doctrine. *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 553 (7th Cir. 2014) (discussing the community caretaking doctrine, the emergency aid doctrine, and the exigent

Case 2:19-cv-00996-JPS   Filed 02/05/21   Page 6 of 29   Document 22

circumstances doctrine). The community caretaking doctrine "recognizes that police sometimes take actions not for any criminal law enforcement purpose but rather to protect members of the public." *Id.*

The U.S. Supreme Court has provided limited guidance on this exception, *see Mason v. Green County*, 451 F. Supp. 3d 984, 993 (W.D. Wis. 2020), and the Seventh Circuit and Wisconsin courts "are divided over the scope of the community caretaker doctrine." *Foshey v. City of Ellsworth Police Officer Sgt. Darren Ekholm*, No. 19-CV-434-SLC, 2020 WL 5367219, at *7 (W.D. Wis. Sept. 8, 2020). The Seventh Circuit "has limited the doctrine to warrantless searches of automobiles." *Id.; but see Woods v. Village of Bellwood*, No. 19-CV-01214, 2020 WL 6894660, at *5 (N.D. Ill. Nov. 24, 2020) (explaining that the community caretaking doctrine may apply when police "check on incapacitated people in vehicles in public places"). Wisconsin courts, on the other hand, "have interpreted the community caretaker doctrine more broadly," going so far as allow the doctrine "to justify certain seizures and warrantless entries into and searches of the home when the police had reason to believe that the occupant might be injured or otherwise in danger." *Foshey*, 2020 WL 5367219, at *7.

While both state and federal courts "possess the authority and indeed the obligation to interpret and apply the Fourth Amendment" where the Supreme Court has not, their differing interpretations sometimes create conflicting rules. *Sutterfield*, 751 F.3d at 554. Certain community-caretaking police actions may be permissible under Wisconsin law but unconstitutional under Seventh Circuit precedent. *Id.* ("Because the Wisconsin courts . . . have accorded a much broader sweep to the community caretaker doctrine . . . [police] [may have had] reason to believe that [their action] was justified."). In these situations, "[q]ualified immunity

gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

Qualified immunity provides government officials a shield from civil liability under § 1983 "insofar as their [discretionary] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Taylor v. Weitzman*, 470 F. Supp. 3d 806, 811 (N.D. Ill. 2020) (explaining qualified immunity in the context of § 1983 actions at the summary-judgment stage). To determine the applicability of qualified immunity at the summary-judgment stage, a court must engage in a two-part analysis to determine whether (1) the facts, viewed in the light most favorable to the non-movant, establish the violation of a constitutional right, and (2) the constitutional right at issue was "clearly established" at the time of the official's purportedly illegitimate conduct. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Taylor*, 470 F. Supp. 3d at 811.

Froemming has failed on prong two of this analysis.[4] "To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation omitted). To defeat a defense of qualified immunity, a plaintiff need not point to a case that is

---

[4]Courts may exercise "their sound discretion in deciding which of the two prongs of the qualified-immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. In this case, the Court will begin with prong two—whether the constitutional right was clearly established at the time of the alleged violation. *See id.* ("In some cases, a discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all.").

factually identical to the present suit, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741. "In other words, immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna,* 577 U.S. 7, 12 (2015)). Wisconsin cases are relevant as to what a reasonable Wisconsin police officer would have thought was permissible in exercising her community caretaking functions. *Sutterfield*, 751 F.3d at 573 ("In the absence of a controlling decision by the United States Supreme Court . . . Wisconsin cases are . . . as relevant as our own precedents in evaluating what a Wisconsin police officer might have thought the law permitted."); *see, e.g.*, *Foshey*, 2020 WL 5367219, at \*7 (considering Wisconsin and federal decisions in determining "whether an officer's conduct properly falls within the scope of the community caretaker exception to the Fourth Amendment's warrant requirement").

Wisconsin courts evaluate an officer's actions under the community caretaking doctrine using a three-part test:

> First, the court considers whether a seizure or search within the meaning of the Fourth Amendment has occurred . . . . Second, the court must determine whether the police conduct was bona fide community caretaking activity, such as the protection of a person . . . . Third, the court weighs the public need and interest in acting on that concern against the degree and nature of the intrusion on the privacy of the individual.

*Foshey*, 2020 WL 5367219, at \*7–8.

First, in this case, all parties agree that a seizure occurred when Officer Carlson pulled her police vehicle behind Froemming, activated its emergency lights, and Froemming rolled down his window in compliance

with her request. (Docket #19 at 2–3; #20 at 3–4). For purposes of summary judgment, the Court will accept that Froemming was seized. *In re Kelsey C.R.*, 626 N.W.2d 777, 787 (Wis. 2001) ("[T]o effect a seizure, an officer must make a show of authority, and the citizen must actually yield to that show of authority.").

Second, the Court must determine whether Officer Carlson was conducting a bona fide community caretaking function when she seized Froemming. A court must "assess the totality of the circumstances surrounding [the officers'] conduct." *State v. Rice*, 786 N.W.2d 489 (Table), 2010 WL 1233936, at *5 (Wis. Ct. App. Apr. 1, 2010). "Where the totality of the circumstances provides an objectively reasonable basis for community caretaker activity, the police conduct meets the bona fide community caretaker standard." *Id.*

In *Long v. United States*, 847 F.3d 916, 921 (7th Cir. 2017), an officer noticed Long asleep behind the wheel of a vehicle while in line at a fast-food drive through. The officer approached Long, knocked on the window of his vehicle, and asked him to open the door. *Id.* The court held that the officer was engaged in a community caretaking function when he instructed Long to open the car door to determine whether Long was safe. *Id.* (quoting *Sutterfield*, 751 F.3d at 553) ("The Constitution allows officers to perform these kinds of caretaking functions because, in doing so, they are 'tak[ing] actions not for any criminal law enforcement purpose but rather to protect members of the public.'"); *see also Woods*, 2020 WL 6894660, at *5 ("The police are allowed to check on incapacitated people in vehicles in public places without running afoul of the Constitution."); *Karney v. City of Naperville*, No. 15 C 4608, 2016 WL 6082354, at *5 (N.D. Ill. Oct. 18, 2016) (finding that "it was reasonable for the police officers, acting in their

community caretaking function, to wake Plaintiff up to check on his status" when they found him sleeping in his running car in a parking lot); *State v. Myer*, 895 N.W.2d 104 (Table), 2016 WL 7437661, at \*3 (Wis. Ct. App. Dec. 22, 2016) ("It is true that [the defendant] could have been 'simply sleeping,' but there was also a realistic possibility that he was at risk of harm.").

In the present case, both parties stipulate that "Officer Carlson observed Mr. Froemming slumped over in the driver seat of a vehicle with the tail and headlights on," and that "the tail lights in the vehicle remain[ed] illuminated for nearly 10 minutes not going out until after 3:19 AM." (Docket #20-1 at 4). Defendant was parked in a rental car without a permit in a location requiring one. (*Id.* at 10). The parties dispute whether the vehicle was actually running at the time Froemming was seized, but they do not dispute that the vehicle's lights were on. (*Id.* at 40). Officer Carlson testified (and Froemming appears to accept as true) that she "did not think [Froemming] had done anything wrong, [and] that is why [she] was investigating." (Docket #19 at 5).[5] Under these circumstances, it was objectively reasonable for Officer Carlson to exercise her community caretaking responsibilities. She had reason to believe that a person was potentially operating a running vehicle while in an unfit state of consciousness to do so safely. It was reasonable for her to believe that Froemming was in need of assistance.

Finally, the Court must weigh the public need and interest in Officer Carlson acting on her concern for Froemming's well-being against the

---

[5]Froemming argues that because Officer Carlson did not immediately call for emergency medical services, she was not engaged in community caretaking. (Docket #19 at 5). However, an officer may assess the scene to determine whether emergency medical care is needed before calling an ambulance. *See, e.g.*, *State v. Ferguson*, 629 N.W.2d 788, 791 (Wis. Ct. App. 2001).

degree and nature of the intrusion on his privacy. *Foshey*, 2020 WL 5367219, at *8. To do this, courts evaluate the following four factors:

> (1) the degree of the public interest and the exigency of the situation; (2) the attendant circumstances surrounding the search, including time, location, the degree of overt authority and force displayed; (3) whether an automobile is involved; and (4) the availability, feasibility and effectiveness of alternatives to the type of intrusion actually accomplished.

*Id.* In this case, the seizure occurred on a public roadway in the early hours of the morning. At the time of the initial seizure, Officer Carlson's limited display of authority included pulling her vehicle behind Froemming, activating the emergency lights (without using the siren), knocking on Froemming's window, and requesting that he lower it. Froemming was in a vehicle—a setting that, famously, is entitled to a lower degree of privacy. *See Cardwell v. Lewis*, 417 U.S. 583, 590 (1974) ("One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects."). The public has an interest in the police ensuring the safety of persons passed out in vehicles with activated lights.

Froemming has failed to show "that, in light of Wisconsin precedent existing at the time, [Officer Carlson] was 'plainly incompetent'" in her initial actions with him. *Foshey*, 2020 WL 5367219, at *8. Officer Carlson acted reasonably pursuant to the community caretaking doctrine under Wisconsin law, and, therefore, she is shielded from liability under qualified immunity. The Court will grant summary judgment for Defendants on Froemming's claim that he was unlawfully detained in violation of the Fourth Amendment.

### 3.2 Unlawful Arrest in Violation of the Fourth Amendment

Froemming alleges that he was unlawfully arrested in violation of the Fourth Amendment by Sgt. Treep, Officer Carlson, and Officer Stuettgen. Defendants argue that the arresting officers had probable cause to arrest Froemming for violation of Wisconsin's operating-a-vehicle-while-intoxicated ("OWI") law. Wis. Stat. § 346.63(1)(a) (2020). For the reasons below, the Court will grant summary judgment for Defendants on this claim.

Although a police interaction may begin under the community caretaking doctrine, police subsequently may obtain probable cause to sustain further investigation and an arrest. *See Long*, 847 F.3d at 921. Defendants claim the arresting officers had probable to arrest Froemming under Wisconsin's OWI law, which provides that "[n]o person may drive or *operate* a motor vehicle while . . . [u]nder the influence of an intoxicant . . . which renders him or her incapable of safely driving." Wis. Stat. § 346.63(1)(a) (emphasis added). "'Operate' means the physical manipulation or activation of any of the controls of a motor vehicle necessary to put it in motion." *Id*. § 346.63(3). The Court must determine whether the arresting officers reasonably believed there was probable cause that Froemming had operated a vehicle while under the influence and, therefore, are protected by qualified immunity. *See Biddle v. Martin*, 992 F.2d 673, 676 (7th Cir. 1993) (noting that, in the context of § 1983 actions for unlawful arrests, "if reasonable police officers would have believed that probable cause existed to arrest [the plaintiff], [the police officers] are entitled to qualified immunity from [the plaintiff's] suit.").

"In determining whether probable cause exists, [a court] must look to the totality of the circumstances." *State v. Babbitt*, 525 N.W.2d 102, 104

Case 2:19-cv-00996-JPS   Filed 02/05/21   Page 13 of 29   Document 22

(Wis. Ct. App. 1994); *see also State v. Mertes*, 762 N.W.2d 813, 818 (Wis. Ct. App. 2008) ("[O]peration for purposes of the drunk driving laws can be proved circumstantially.") (internal quotations and citations omitted). Under Wisconsin law as it relates to OWI offenses, probable cause does not "arise[] simply from smelling alcohol on a person who has alighted from a vehicle after it has stopped—and nothing else." *State v. Meye*, 789 N.W.2d 755, 755 (Wis. Ct. App. 2010) (surveying Wisconsin case law).

In *Milwaukee County v. Proegler*, 291 N.W.2d 608 (Wis. Ct. App. 1980), the Wisconsin Court of Appeals determined that officers had probable cause to arrest a person for an OWI offense where the person was found sleeping in the driver seat of his running vehicle parked on an emergency ramp with the keys in the ignition. The court wrote,

> [t]he prohibition against the "activation of any of the controls of a motor vehicle necessary to put it in motion" applies either to turning on the ignition or leaving the motor running while the vehicle is in "park." One who enters a vehicle while intoxicated, and does nothing more than start the engine is as much of a threat to himself and the public as one who actually drives while intoxicated. The hazard always exists that the car may be caused to move accidently, or that the one who starts the car may decide to drive it.

*Id.* at 626. Wisconsin courts have further noted that to "operate" a vehicle under section 346.63(3) "does not require movement." *State v. Modory*, 555 N.W.2d 399, 401 (Wis. Ct. App. 1996). "The statute only requires that the defendant physically manipulate or activate any of the controls necessary to put [the motor vehicle] in motion." *Id.* (internal quotations and citations omitted).

Case 2:19-cv-00996-JPS   Filed 02/05/21   Page 14 of 29   Document 22

In a subsequent case, the Wisconsin Court of Appeals had the opportunity to address whether police had probable cause for an OWI offense where they arrested a defendant after they found him sleeping in the driver seat of a vehicle parked at a gas station with the *engine off*. *Mertes*, 762 N.W.2d at 817–18. The vehicle's lights were on and the key was in the ignition. *Id.* Upon arriving at the scene, the officers had to knock several times to awaken the two occupants of the vehicle, and the defendant then removed the keys from the ignition. *Id.* at 814–15. The officers noticed the smell of intoxicants. *Id.* at 815. The defendant told the officers that he had driven to the gas station and had been there for about ten minutes. The court held that, based on the circumstantial evidence, the jury was permitted to find that the police had probable cause to believe that the defendant had violated the OWI law by operating the vehicle under the influence. *Id.* at 818. "[E]ven absent a running motor," the police may have enough circumstantial evidence to reasonably believe the occupant in the car had operated the vehicle under the influence. *Id.*; *see also Burg ex rel. Weichert v. Cincinnati Cas. Ins. Co.*, 645 N.W.2d 880, 886 n.8 (Wis. 2002) ("'[O]peration' for purposes of the drunk driving laws can be proved circumstantially. A defendant found intoxicated behind the wheel of a parked car with its engine off but still warm might well be prosecuted on that circumstantial evidence of recent 'operation.'").[6]

---

[6]The Wisconsin Supreme Court's footnote in *Burg* does not stand for the proposition that a turned-off engine *must* be warm in order to support probable cause, as Froemming may believe. Instead, the court was elaborating that a warm engine may provide the additional circumstantial evidence needed—beyond a person merely sitting in their vehicle—for the police to have probable cause that a person was operating the vehicle.

Case 2:19-cv-00996-JPS   Filed 02/05/21   Page 15 of 29   Document 22

In the present case, the police found Froemming asleep behind the wheel of a vehicle at around 3:00 AM. (Docket #20-1 at 1). Whether the vehicle was running at the time Officer Carlson made her first contact with Froemming is contested by the parties, but the taillights and headlights were activated. (*Id.* at 4). Officer Carlson had to knock on the driver-side window several times to elicit a response from Froemming. (*Id.* at 6). Froemming agrees he then started the vehicle using the push-to-start mechanism in order to roll down his window. (*Id.* at 6–7). Froemming first told Officer Carlson he had come from his mother's house, but then he said he come from his friend's house and that he had been "cruising" around the neighborhood. These statements gave Officer Carlson reason to believe that Froemming had driven to his present location. (*Id.* at 8); *cf. Village of Cross Plains v. Haanstad*, 709 N.W.2d 447, 452 (Wis. 2006) (concluding that defendant did not operate a vehicle where there was no evidence that she "dr[o]ve the car to the point where the officer found her behind the wheel," and plaintiff "offered no circumstantial evidence to prove that [defendant] had operated the vehicle"). The officers were faced with enough circumstantial evidence such that a reasonable officer facing similar circumstances would have believed she had probable cause that Froemming had or would operate the vehicle. This, combined with Froemming's outward signs of intoxication,[7] was enough to support the

---

[7] The "signs of intoxication" proffered by Defendants include that Froemming "smelled of intoxicants, slurred his speech, and had red, bloodshot, glassy eyes." (Docket #17-3 at 7). After searching the parties' submissions, the Court is unable to find an instance of Froemming challenging whether he did, in fact, exhibit these outward signs of intoxication. Froemming does not attack Defendants' basis for probable cause on whether the officers witnessed signs of intoxication in him. Instead, he continually raises legal arguments "specifically challeng[ing] the probable cause that he was 'operating' the vehicle" at the time of

officers' belief that they had probable cause to arrest Froemming for an OWI offense. Thus, the officers are shielded by qualified immunity, and the Court will grant Defendants' motion for summary judgment on Froemming's claim of unlawful arrest in violation of the Fourth Amendment.

### 3.3 Excessive Force in Violation of the Fourth and Fourteenth Amendment

Froemming next argues that Sgt. Treep, Officer Carlson, and Officer Stuettgen used excessive force when arresting him, in violation of the Fourth and Fourteenth Amendments. Defendants argue that the arresting officers used the minimum amount of force necessary to execute a lawful arrest. For the reasons stated below, the Court will grant, in part, and deny, in part, Defendants' motion for summary judgment as to Froemming's claims of excessive force.

The Court will begin by examining Froemming's claim of excessive force in violation of his "Constitutional right under the Fourteenth Amendment to bodily integrity and to be free from excessive force by law enforcement." (Docket #1 at 22). Froemming is attempting to bring an excessive force claim under a theory of substantive due process. *Obriecht v. Raemisch*, No. 10-CV-221, 2011 WL 2746133, at *5 (E.D. Wis. July 13, 2011) ("Substantive due process claims have historically been related to matters involving . . . the right to bodily integrity."). However, "[w]here, as here, the excessive force claim arises in the context of an arrest . . . it is most

_____

his seizure. (Docket #19 at 8–9). Accordingly, the Court will "consider the fact [that Froemming displayed certain signs of intoxication] undisputed for purposes of the [summary judgment] motion." Fed. R. Civ. P. 56(e)(2); *see also* Civ. L.R. 56(b)(4) ("The Court will deem uncontroverted statements of material fact admitted solely for the purpose of deciding summary judgment.").

properly characterized as one invoking the protections of the Fourth Amendment," not of the Fourteenth Amendment. *Graham v. Connor*, 490 U.S. 386, 394 (1989). Accordingly, the Court will grant summary judgment to Defendants as to Froemming's excessive force claim brought under the Fourteenth Amendment.

The Court next turns to Froemming's excessive force claim brought under the Fourth Amendment. The Fourth Amendment "guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person." *Id.* (quoting U.S. Const. amend. IV). Accordingly, "all claims that law enforcement officers have used excessive force . . . in the course of an arrest . . . should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Id.* at 395. "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). When engaging in this type of balancing, courts generally consider the following, nonexclusive list of factors:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).

"The reasonableness inquiry is an objective one, examining 'whether the officer's actions are objectively reasonable in light of the totality of the

Case 2:19-cv-00996-JPS   Filed 02/05/21   Page 18 of 29   Document 22

facts and circumstances confronting him or her, without regard for consideration of the officer's subjective intent or motivations." *Payne v. Stacy*, No. 18-CV-850, 2020 WL 886185, at *3 (E.D. Wis. Feb. 24, 2020), *appeal dismissed*, No. 20-1509, 2020 WL 5793102 (7th Cir. June 12, 2020) (quoting *Estate of Williams v. Ind. State Police Dep't*, 797 F.3d 468, 473 (7th Cir. 2015)). The actions taken by an officer "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)). A court should "keep in mind that police must make split-second decisions in tense, uncertain situations." *Wis. Carry, Inc. v. City of Milwaukee*, 35 F. Supp. 3d 1031, 1038 (E.D. Wis. 2014).

It is true, as Defendants explain, that all arrests involve some form of touching and minimal use of force—"mere handcuffing, without more, cannot form the basis of a complaint under [§ 1983]." *Bur v. Gilbert*, 415 F. Supp. 335, 342 (E.D. Wis. 1976). However, Froemming alleges more than just handcuffing. He alleges that the car's seatbelt was choking him as the officers pulled out of the vehicle and that any resistance he gave during the physical altercation was in an attempt to ensure the seatbelt did not choke him. (Docket #19 at 13). The officers in the video can be heard discussing that they needed to unbuckle the seatbelt, which indicates that, in fact, it may have been choking Froemming.

Froemming also claims that once taken to the ground by the officers, "several officers us[ed] their boots and knees to hold him to the ground even though he was not resisting." (Docket #1 at 10). It is unclear from the video the level of force the officers used on Froemming once he was on the ground. Froemming lies just outside of the frame of the video, and one officer intermittently obstructs the view of the camera. Further, Froemming

Case 2:19-cv-00996-JPS   Filed 02/05/21   Page 19 of 29   Document 22

rebuts Defendants' claim that he was not injured during this incident. Froemming asserts that he sustained injuries causing bruising to his face, and the Court is not able to determine from his booking photo whether Froemming sustained such bruising. (Docket #17-15); *Chelios v. Heavener*, 520 F.3d 678, 690 (7th Cir. 2008) ("Although injury is a relevant factor in determining whether an officer used excessive force, an excessive force claim does not require any particular degree of injury.").

At the summary judgment stage, without a factual determination of what happened during the arrest, the Court cannot determine whether the force used on Froemming was reasonable or excessive. With such disparate accounts of what happened and unclear video footage of the event, summary judgment is not appropriate on the merits of Froemming's Fourth Amendment excessive force claim. *See Rodriguez v. City of Berwyn*, No. 16 C 5106, 2018 WL 5994984, at *12 (N.D. Ill. Nov. 15, 2018) ("The Seventh Circuit has cautioned that 'summary judgment is often inappropriate in excessive force cases' because 'the parties typically tell different stories about what happened' . . . and because 'evidence surrounding the officer's use of force is often susceptible to different interpretations.'") (quoting *Catlin v. City of Wheaton*, 574 F.3d 361, 367 (7th Cir. 2009)).

### 3.4    Malicious Prosecution

Defendants also move for summary judgment on Froemming's claim that he was maliciously prosecuted in violation of the Fourth and Fourteenth Amendments by Sgt. Treep, Officer Carlson, and Officer Stuettgen. For the reasons explained below, the Court will grant summary judgment to Defendants on this claim.

Under present Seventh Circuit law, "there is no such thing as 'Fourth Amendment malicious prosecution,'" and such claims are "plainly

bar[red] . . . where . . . there is an adequate state law remedy." *Stone v. Wright*, 734 F. App'x 989 (7th Cir. 2018) (citing *Manuel v. City of Joliet*, 137 S. Ct. 911, 917–20 (2017)); *Baker v. City of Chicago*, No. 16-CV-08940, 2020 WL 5110377, at *6 (N.D. Ill. Aug. 31, 2020); *see also Andersen v. Village of Glenview*, No. 17-CV-05761, 2018 WL 6192171, at *13 (N.D. Ill. Nov. 28, 2018), *aff'd*, 821 F. App'x 625 (7th Cir. 2020) (rejecting any federal malicious prosecution claim under the Fourth or Fourteenth Amendment because "as the Seventh Circuit has repeatedly explained, there is no free-standing constitutional tort of malicious prosecution") (internal quotations and citations omitted).

Here, Froemming has not brought forth a "cognizable claim under federal law." *Metcalf v. Flamburis*, No. 18 C 7637, 2020 WL 5891402, at *4 (N.D. Ill. Oct. 5, 2020). This is because Wisconsin law affords a remedy for malicious prosecution. *See Krieg v. Dayton-Hudson Corp.*, 311 N.W.2d 641, 643 (Wis. 1981) (discussing the elements of malicious prosecution under Wisconsin law). As Froemming did not bring a malicious prosecution claim under Wisconsin law, the Court need not wade into whether his claim would pass inspection. Accordingly, the Court will grant Defendants' motion for summary judgment on Plaintiff's claim of malicious prosecution in violation of the Fourth and Fourteenth Amendments.

### 3.5    Retaliation in Violation of the First Amendment

Froemming next argues that Sgt. Treep, Officer Carlson, and Officer Stuettgen unconstitutionally retaliated against him for exercising his First Amendment, "constitutionally protected right to question law enforcement and/or engage in protected speech related to the constitutional rights of citizens with respect [to the Fourth Amendment]." (Docket #1 at 26). Froemming asserts that the officers were motivated to (1) arrest him, and (2) use excessive force on him because he questioned their authority to

search his car and person. (*Id.*) Defendants moved for summary judgment on Froemming's retaliation claim, and the Court will grant that request.

At the summary judgment stage, the plaintiff has the initial burden to make out a prima facie case of First Amendment retaliation by showing that, "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation likely to deter such activity; and (3) the First Amendment activity was at least a motivating factor in the decision to impose the deprivation." *Hawkins v. Mitchell*, 756 F.3d 983, 996 (7th Cir. 2014). If the plaintiff meets this burden, "the burden shifts to the defendant to rebut the causal inference created by the plaintiff's showing and to prove that it would have taken the same action regardless of the plaintiff's protected activity." *Brock v. City of Belleville*, No. 17-CV-218-JPG-SCW, 2018 WL 2320511, at *7 (S.D. Ill. May 22, 2018). Then, "[i]f the defendant is successful in rebutting the plaintiff's prima facie case . . . the burden shifts back to the plaintiff to demonstrate that the defendant's proffered reason was pretextual and that the real reason was retaliatory animus." *Id.* Essentially, the plaintiff must show that "the defendant's proffered reason is a lie." *Zellner v. Herrick*, 639 F.3d 371, 379 (7th Cir. 2011). Importantly, "in most cases, probable cause to arrest defeats a claim of retaliatory arrest." *Lund v. City of Rockford*, 956 F.3d 938, 941 (7th Cir. 2020).

To begin, the police reasonably believed that they had probable cause to arrest Froemming for an OWI violation. *See supra* Section 3.2. Thus, Froemming's claim that he was arrested in retaliation for exercising his First Amendment rights fails, and the Court will grant summary judgment to Defendants. The Court will now turn to Froemming's assertion that police used excessive force on him in retaliation.

First, it appears from the record that at least some of the statements Froemming made during the incident may be protected speech under the First Amendment. For instance, his continual assertions that he was not "operating" a vehicle and suggestions that the officers could spend their time better by apprehending actual "criminal[s]" may constitute protected speech. *See City of Houston v. Hill*, 482 U.S. 451, 461 (1987) ("[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers."); *Abrams v. Walker*, 307 F.3d 650, 654 (7th Cir. 2002), *abrogated on different grounds by Spiegla v. Hull*, 371 F.3d 928 (7th Cir. 2004) ("Our Constitution permits citizens to criticize police officers, within reason, both verbally and nonverbally."). Second, the question of whether the officers used excessive force on Froemming remains an open one that cannot yet be resolved on summary judgment. *See supra* Section 3.3.

But it is on prong three that Froemming most flatly fails. Even construing Froemming's pro se complaint liberally, the Court struggles to glean factual allegations that support the assertion that the officers' alleged use of excessive force was motivated by retaliation for Froemming's protected speech. His main, conclusory allegation is that "[r]etaliatory animus for [his protected speech] . . . was a substantial motivating factor in the excessive force used by individual defendants." (Docket #1 at 26). Froemming seems to hint that, (1) the absence "of any wrongdoing . . . [and] discernable threats" to the officers, (2) the proximity between his protected speech and the alleged excessive force, and (3) his cooperation with the officers serve as evidence that his constitutionally protected speech was the motivating factor of the officers' actions.

Defendants (without admitting use of excessive force) have "rebut[ted] the causal inference created by the plaintiff[]" and shown that

Case 2:19-cv-00996-JPS   Filed 02/05/21   Page 23 of 29   Document 22

they "would have taken the same action regardless of the plaintiff's protected activity." *Brock*, 2018 WL 2320511, at *7. They have alleged sufficient probable cause for arresting Froemming—meaning that there was evidence of wrongdoing at the time of the incident and any actions they took were in response to that. The video shows that Froemming was refusing to comply with the officers' orders to exit the vehicle. *See State v. Hobson*, 577 N.W.2d 825, 837 (Wis. 1998) (holding that there is no privilege to forcibly resist unlawful arrests). And further, "while timing may circumstantially support a retaliation claim, timing alone cannot support a finding of retaliation." *Mearday v. City of Chicago*, 196 F. Supp. 2d 700, 713 (N.D. Ill. 2002).

Finally, Froemming fails to meet his burden of showing that the police would not have acted as they did "but for" Froemming having exercised his constitutionally protected speech and that Defendants' reasoning is entirely "pretextual." *Brock*, 2018 WL 2320511, at *7. Based on the showings made by Froemming, a jury could not find that Defendants would not have taken their alleged actions but for Froemming exercising his constitutionally protected right to free speech. Accordingly, the Court will grant summary judgment to Defendants on Froemming's claims of First Amendment retaliation.

### 3.6    Training Policies, Procedures, and Practices

Lastly, Froemming claims that Defendants West Allis and Chief Mitchell "developed and maintained policies, procedures, customs, and/or practices exhibiting deliberate indifference to the constitutional rights of citizens," and that such practices were the cause of his injuries. (Docket #1 at 34). The Court will grant, in part, and deny, in part, Defendants' motion for summary judgment as to this claim.

In *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 694 (1978), the Supreme Court established that the government can be held liable under § 1983 "when the execution of a government's policy or custom, whether made by its lawmakers or those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." However, the Supreme Court concluded "that a municipality cannot be held liable *solely* because it employs a tortfeasor—or in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691. Therefore, "[f]or . . . liability to attach, a constitutional violation must be brought about by (1) an express municipal policy; (2) a widespread, though unwritten, custom or practice; or (3) a decision by a municipal agent with 'final policymaking authority.'" *Terry v. County of Milwaukee*, Case No. 17–CV–1112–JPS, 2018 WL 2567721, *5 (E.D. Wis. June 4, 2018) (quoting *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 629 (7th Cir. 2009)). This requirement serves to "distinguish acts of the municipality from acts of [its] employees . . . and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Grieveson v. Anderson*, 538 F.3d 763, 771 (7th Cir. 2008) (internal quotations and citations omitted). Additionally, "to state a § 1983 claim against a municipality, the complaint must allege that an official policy or custom not only caused the constitutional violation, but was 'the moving force' behind it." *Estate of Sims v. County of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007) (quoting *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)).

Where the plaintiff proceeds under the "second species of *Monell* liability" (i.e., that there was a widespread, though unwritten, custom or practice), he "must plead facts allowing the reasonable inference that [d]efendants were deliberately indifferent to these widespread practices."

*Estate of Fiebrink v. Armor Corr. Health Servs., Inc.*, No. 18-CV-832-JPS, 2019 WL 1980625, at *3 (E.D. Wis. May 3, 2019), *appeal dismissed sub nom. Estate of Fiebrink v. Armor Corr. Health Serv., Inc.*, No. 19-2060, 2019 WL 6499430 (7th Cir. June 20, 2019). The plaintiff may demonstrate this "by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on," and therefore, "by failing to do anything must have encouraged or at least condoned [the activity]." *Jackson v. Marion County*, 66 F.3d 151, 152 (7th Cir. 1995). The plaintiff must plead facts alleging that the "gap" in defendant's policies reflected a decision to act unconstitutionally. *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005). In assessing whether the absence of a policy or protocol gives rise to a decision to violate a person's constitutional rights, the Court will look for "evidence that there is a true municipal policy at issue, not a random event." *Id.*

In the present case, Froemming fails to precisely articulate exactly which "policies, procedures, customs, and/or practices" were maintained by Defendants with deliberate indifference for his constitutional rights. The Court, in attempting to understand Froemming's complaint, determines that he generally alleges that there are widespread, though unwritten, customs or practices that allow police to (1) seize persons without probable cause, (2) use excessive force during arrests, (3) retaliate when citizens exercise their First Amendment rights, (4) discriminate, (5) maliciously prosecute the accused, (6) destroy and tamper with evidence, and (7) falsely testify. Accordingly, Froemming "must plead facts allowing the reasonable inference that Defendants were deliberately indifferent to these widespread practices." *Estate of Fiebrink*, 2019 WL 1980625, at *3.

The Court will grant summary judgment for Defendants as to polices 1, 3, 4, and 5. Where there are no underlying constitutional violations, there can be no "direct causal link" between the policies and a constitutional violation. *City of Canton*, 489 U.S. at 386 ("[A] municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue."). As discussed in the previous sections, the Court will award summary judgment to Defendants on the alleged constitutional violations underlying policies 1, 3, and 5. *See supra* Sections 3.1, 3.4, and 3.5. And, as to policy 4, Froemming has raised no claims that he was discriminated against. Therefore, the Court will grant summary judgment for Defendants as to polices 1, 3, 4, and 5.

The Court will also grant summary judgment for Defendants as to policy 2. Again, where the plaintiff alleges that there was a widespread, though unwritten, custom or practice, he or she may demonstrate this "by showing a series of bad acts" which allows a court to draw an inference that such a custom or practice exists. *Jackson*, 66 F.3d at 152. As to whether there was an unwritten custom or practice in West Allis allowing police to use excessive force, Froemming has alleged only one case of (possible) excessive force—his own.[8] This is not a "series" of incidents in which West Allis police officers consistently show disregard for the constitutional rights of citizens. Accordingly, the Court will grant summary judgment for Defendants as to policy 2.

Finally, the Court will deny Defendants' request for summary judgment as to policies 6 and 7. "Stripping the . . . complaint of its excess

---

[8]Froemming offers a vague reference with little explanation to a case that was dismissed in this District by stipulation, *Kraus v. City of West Allis*, 10-CV-718. (Docket #19 at 20). The Court will not consider this case.

legal verbiage, what [Froemming] complains about, in constitutional terms, is the denial of his due process right to a fair trial" when Defendants allegedly followed the unwritten custom to "suborn[] perjury and fabricate[] evidence to procure his conviction." *LaBoy v. Zuley*, No. 90 C 545, 1993 WL 390249, at *4 (N.D. Ill. Sept. 30, 1993). Froemming presents factual allegations which, if true, may demonstrate a pattern of Defendants modifying and destroying video and recorded evidence from his arrest. (Docket #1 at 18–21). He also points to several occasions on which testifying officers gave testimony conflicting with their previous statements, as well as statements Froemming claims are factually inaccurate (e.g., the timing of his breathalyzer test). (*Id.*) Defendants have offered little argument on this issue. (Docket #17-3 at 14–15). At this juncture, the Court cannot grant summary judgment on the allegation that Defendants were operating pursuant to unwritten customs or policies that resulted in a violation of Froemming's constitutional rights. Thus, Froemming's claim as to policies 6 and 7 will proceed.

### 4.    CONCLUSION

As discussed, the Court will grant Defendants' motion for summary judgment as to Froemming's claims of (1) unlawful detention in violation of the Fourth Amendment, (2) unlawful arrest in violation of the Fourth Amendment, (3) excessive force in violation of the Fourteenth Amendment, (4) malicious prosecution, and (5) maintaining certain policies (policies 1, 2, 3, 4, and 5) with deliberate indifference to the constitutional rights of citizens. The Court will deny summary judgment to Defendants on Froemming's claims of (1) excessive force in violation of the Fourth Amendment, and (2) maintaining certain policies (policies 6 and 7) with

deliberate indifference to the constitutional rights of citizens. There remain genuine disputes of material fact concerning these claims.

Given the uncertain breadth, depth, and trajectory of COVID-19, the pandemic presents an overarching need to protect the health and safety of the parties, counsel, jurors, and witnesses, together with the Court's staff and the public. Accordingly, the Court will withhold issuing a trial scheduling order until such time as circumstances allow for in-person proceedings to be conducted safely.

Accordingly,

**IT IS ORDERED** that Defendants' motion for summary judgment (Docket #17) be and the same is hereby **GRANTED in part** as to Froemming's claims of (1) unlawful detention in violation of the Fourth Amendment, (2) unlawful arrest in violation of the Fourth Amendment, (3) excessive force in violation of the Fourteenth Amendment, (4) malicious prosecution, and (5) maintaining certain policies (policies 1, 2, 3, 4, and 5) with deliberate indifference to the constitutional rights of citizens; and

**IT IS ORDERED** that Defendants' motion for summary judgment (Docket #17) be and the same is hereby **DENIED in part** as to Froemming's claims of (1) excessive force in violation of the Fourth Amendment and (2) maintaining certain policies (policies 6 and 7) with deliberate indifference to the constitutional rights of citizens.

Dated at Milwaukee, Wisconsin, this 5th day of February 2021.

BY THE COURT:

_____

J. P. Stadtmueller
U.S. District Judge