# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

WILLIAM C. FROEMMING,

                    Plaintiff,

v.                                                    Case No. 19-CV-996-JPS

OFFICER LETE CARLSON, OFFICER
RYAN STUETTGEN, and SERGEANT          **ORDER**
WAYNE TREEP,

                    Defendants.[1]

## 1.     INTRODUCTION

This matter came before the Court for a jury trial commencing on
February 13, 2023. ECF No. 57. Midday on February 14, the jury returned a
verdict for Defendants.[2] ECF No. 61. Before the case was submitted to the
jury, Plaintiff William C. Froemming ("Plaintiff") moved for a mistrial, first
orally, ECF No. 63 at 8, and thereafter, upon a written motion, ECF No. 59.
The Court denied Plaintiff's oral motion from the bench. ECF No. 63 at 8. In
a text order entered February 15, 2023, the Court directed Defendants to

---

[1]The City of West Allis and Chief Patrick Mitchell ("Chief Mitchell") are
omitted from the caption due to the Court's conclusion at trial that there was no
basis found for Plaintiff's claims as to policies to tamper with evidence and to
provide false testimony to be presented to the jury. ECF No. 57. In light of the
disposition of those claims, Defendants the City of West Allis and Chief Mitchell
had no remaining claims against them and were effectively dismissed from this
action. For the sake of completeness, the Court clarifies that the City of West Allis
and Chief Mitchell stand dismissed from this action and shall be terminated on the
case docket.

[2]Consistent with the prior footnote, for purposes of this Order
"Defendants" denotes the three officers named in the caption.

respond to the written motion. For the reasons provided herein, the Court will once again deny the motion.

Beyond their response, Defendants also filed two motions for sanctions against Plaintiff. ECF Nos. 66, 67. For the reasons discussed herein, the Court will deny the first motion for sanctions, ECF No. 66, but will grant in part the second motion for sanctions, ECF No. 67.

## 2. BACKGROUND

### 2.1 Factual Background

On July 14, 2016, at approximately 3:00 A.M., West Allis Police Officer Lete Carlson ("Officer Carlson") encountered Plaintiff, a resident of Hawaii, passed out in a rental vehicle parked at the curb in a residential neighborhood in West Allis. ECF No. 22 at 2. Officer Carlson circled past Plaintiff several times and ultimately pulled up behind his vehicle to assess the situation. She observed that the vehicle's headlights and taillights were on and suspected that the vehicle was running, although Plaintiff denies that the engine was running. *Id.*

Officer Carlson activated her squad vehicle's emergency lights, as well as her squad camera and body-worn microphone, and approached Plaintiff's vehicle. *Id.* Through the window, she observed that Plaintiff was "slumped over" in the vehicle. ECF No. 62 at 73. She knocked on the window but received no response. She knocked again and ordered Plaintiff to roll down his window. ECF No. 22 at 3. Plaintiff woke and rolled his window down approximately two inches. Officer Carlson asked him to roll it down further, and Plaintiff asked if she could hear him. *Id.* She confirmed that she could, and the window remained rolled down only two inches. *Id.*

Officer Carlson explained to Plaintiff that she had noticed him passed out in the vehicle and inquired as to who he was and how he had

arrived there. *Id.* Plaintiff stated that he had been coming from his mother's house. *Id.* Later in the conversation, he told her he had come from a friend's house. *Id.* He informed Officer Carlson that he had just been "cruising" around and was not sure how long he had been parked there. *Id.*

Officer Carlson asked Plaintiff for identification, which he refused to provide. He initially also refused to identify himself verbally. Plaintiff became agitated, argumentative, and confrontational, while Officer Carlson maintained a calm and professional demeanor. Plaintiff told Officer Carlson he was not driving, so she could not "stop" him. *Id.* Officer Carlson explained that she pulled up behind him and was questioning him because she saw him slumped over, he could not explain where he was or how long he had been there, he smelled of alcohol, and he refused to identify himself. *Id.* at 3–4. Plaintiff continued to insist that he did not need to comply and that Officer Carlson could not legally "stop" him while he was parked. *Id.* at 4.

Officer Carlson then radioed for assistance. Shortly thereafter, Sergeant Wayne Treep ("Sergeant Treep") arrived on scene and instructed Officer Carlson to move her squad car up closer directly behind Plaintiff's vehicle to ensure that he would be blocked in. *Id.* She did so, and Sergeant Treep spoke with Plaintiff. Additional officers, including Officer Ryan Stuettgen, also arrived at this time. *Id.*

Sergeant Treep informed Plaintiff that if he continued to refuse to comply, the officers would break out the passenger side window and remove him. *Id.* He also told Plaintiff that he could see Plaintiff's glassy, bloodshot eyes. *Id.* Plaintiff refused to provide his identification and continued to argue, so the officers punched out the passenger side window. *Id.* They reached in and unlocked the vehicle doors and opened the driver-

side door. They then removed Plaintiff from the vehicle, pausing to remove his seat belt. *Id*. Plaintiff was described as stiffening his body, which made it more difficult to remove him from the vehicle.

The officers removed Plaintiff, lowered him to the ground, and handcuffed him. *Id*. at 4–5. Officers then searched Plaintiff's person and the vehicle, finding marijuana and a marijuana pipe. *Id.* at 5.

Officer Carlson took Plaintiff to the police station in her squad car. He refused to submit to a breathalyzer test while continuing to demonstrate obstinate behavior. After being issued various municipal citations, he was eventually released into the custody of his mother. *Id*.

### 2.2 Procedural Background

Some three years later, Plaintiff, proceeding pro se, filed his case on July 12, 2019. ECF No. 1. On summary judgment, the Court disposed of various municipal liability claims, a Fourth Amendment unlawful detention claim, a Fourth Amendment unlawful arrest claim, a Fourteenth Amendment excessive force claim, a First Amendment retaliation claim, and a malicious prosecution claim. ECF No. 22.

On September 23, 2022, Plaintiff moved to disqualify opposing counsel, Rebecca Monti ("Attorney Monti"). ECF No. 45. He accused her of lying to the Court both in filings and in open court. He also requested other forms of relief, including that this Court recuse itself, consider disqualifying opposing counsel Kail Decker ("Attorney Decker"), and certify a motion for interlocutory appeal. On September 28, 2022, after the motion became fully briefed, the Court denied the motion. ECF No. 49.

On September 30, 2022, the Friday before the jury trial was scheduled to begin, Plaintiff moved for leave to appeal in forma pauperis and to file an interlocutory appeal. ECF No. 52. Consequently, in a text order that same

day, the Court adjourned the trial. On October 13, 2022, the Court denied Plaintiff's motion to certify an interlocutory appeal. ECF No. 55.

Eventually the case proceeded to trial on February 13, 2023. The following exchange occurred during Plaintiff's direct examination of Chief Mitchell:

| | |
|---|---|
| Plaintiff: | Chief, in the records request that I filed in 2019, you chose to not respond to the accusations against two of the officers on the—on counts of perjury. Why did you not respond? |
| Chief Mitchell: | Do you have a specific document you'd like to share with me? |
| Plaintiff: | Sure. [T]hese are going to be documents 40, 42, and either 43 or 44, I don't know, those have very similar titles. They look to be exactly the same, actually. |
| [. . .] | |
| Attorney Monti: | I am going to object that they are hearsay. |
| [. . .] | |
| The Court: | The witness has asked to see documents, and they may not be admitted insofar as the jury is concerned, but he's certainly entitled to view a document that may serve his recollection. So the objection is overruled. |
| Plaintiff: | Okay. . . . And this would be number 40, four zero. So here are items number seven and eight are both accusations of perjury or also known in some circles as conflicting testimony. |
| Chief Mitchell: | Okay. |

Case 2:19-cv-00996-JPS   Filed 06/14/23   Page 5 of 42   Document 73

| | |
|---|---|
| Plaintiff: | And then next one is going to be number 42. |
| Attorney Decker: | Is there a question about this? |
| Plaintiff: | This would be—Well, I thought I would do them all at once. . . . |
| | So, Chief, you decided rather than responding to each of these complaints individually to respond with a single letter addressing all of the complaints at once; is that correct? |
| Chief Mitchell: | Yes. |
| Plaintiff: | Okay. So are you okay with now reading this one on sergeant Wayne Treep before we proceed to your response? |
| Attorney Monti: | I'll renew my objection, Judge. There's no foundation for this, other than that this is a hearsay document that was submitted to this witness. |
| The Court: | He provided a response based on— That's what the question is. We don't care what's in this document. The reason Mr. Froemming is drawing on it is the witness asked to see documents, and that's exactly what we're doing. The objection is not well taken and is overruled. |
| Chief Mitchell: | So I would prefer to go question by question. |
| Plaintiff: | Okay. |
| Chief Mitchell: | For example, if you have specific questions, I would prefer to deal with one document at a time. |
| Plaintiff: | Okay. But when you—when you wrote your response, you decided you wanted |

|  |  |
|---|---|
|  | to deal with them all at once; is that correct? |
| Chief Mitchell: | Yes. |
| Plaintiff: | Okay. But you want to deal with them individually? |
| Chief Mitchell: | Two completely different things. |
| Plaintiff: | Very good. So in this particular instance right here with sergeant Wayne Treep which would once again be number 42, document number 42, why did you not respond to this accusation of perjury or conflicting statements under oath? |
| [. . .] |  |
| Chief Mitchell: | Going off of my recollection of the letter that I wrote to you several years ago, my recollection was that my letter stated even if true, this would not reflect perjury. . . . When you look at a statement such as this, whether the lights were on or not on, could very easy [sic] see a situation for a police officer one year later to not recall or to have a different recollection. Memory can be frail. |
| Plaintiff: | So that's a great answer. Why did you not include that answer in your response? |
| Chief Mitchell: | I am not required to specifically draft my letter to your approval. I drafted a very lengthy letter back to you where I laid out as many of the allegations as you complained about with a factual basis as to why your complaints were either not sustained or not able to be sustained, and my recollection of my letter was then even if true, this would not rise to the |

| | |
|---|---|
| | level of perjury in any court with any prosecutor that I've ever appeared in front of in my 37-year career. |
| Plaintiff: | So shall we look at your letter? Would you like to see your letter? |
| Chief Mitchell: | That's up to you. I don't need to see it. |
| Plaintiff: | I don't know that I can present it unless you request it. |
| Chief Mitchell: | I don't need to see my letter. |
| Plaintiff: | But you are saying that you did respond to the perjury charges by saying it didn't rise to the level of perjury? |
| Chief Mitchell: | That's my recollection. |
| Plaintiff: | Well, that's not what it says in your letter. Would you like to see your letter? |
| Chief Mitchell: | No. |
| Plaintiff: | So you're denying the evidence because you know that what you're saying right now doesn't agree with it; is that correct? |
| Attorney Monti: | Objection. Argumentative. |
| The Court: | Yeah. Sustained. The jury's instructed to disregard the last question. |
| Plaintiff: | Very good. Let's move to Lete Carlson's complaint. This would be number 40. Exhibit No. 40. |
| Chief Mitchell: | And do you have a question? |
| Plaintiff: | Why did you not—Why did you not respond to these accusations of conflicting testimony under oath? |
| Chief Mitchell: | I did respond, and, again, to refresh your memory, my response was that even if |

|  | true, these would not rise to the level of perjury. I have not met a prosecutor in my 37-year career that would view this as perjury. |
|---|---|
| [. . .] | |
| Plaintiff: | Your Honor, I ask that his response be submitted to the record because he has referenced it and is claiming that he says one thing in that response, and I know that it does not say anything such. |
| The Court: | Well, we have spent an inordinate amount of time not only beating what might be described charitably as a dead horse but flagellating it. And so the time has come to cut to the chase and get to the bottom of the core issue in this case which is, frankly, being obfuscated by this line of questioning. |

ECF No. 62 at 205–211. Plaintiff concluded the presentation of his case in chief that same day. ECF No. 57 at 7. He did not testify himself, nor did he show the portion of the squad camera footage depicting his removal from the vehicle.

Defendants moved for a directed verdict, and the Court addressed argument on the motion. *Id*. The Court took the motion under advisement to the extent it related to the Fourth Amendment excessive force claim. *Id*. The Court then concurred that the municipal liability claims regarding lying under oath and tampering with evidence would not go to the jury. *Id*.

On the second morning of trial, February 14, 2023, Plaintiff entered the courtroom in a highly agitated state, holding a bloody bandage to his head. *See generally* ECF No. 63. He began loudly relaying that he had been attacked the night prior and that he had returned to his hotel room to find

items disturbed. *Id.* He insinuated that Attorneys Monti and Decker were involved in the attack. *Id*. He suggested that they orchestrated an attack on him by the Defendant officers as a means of retaliation.

In making these accusations, Plaintiff leaned over Defendants' counsel table. His proximity to Attorneys Monti and Decker together with his threatening demeanor towards them concerned courtroom staff, who repeatedly instructed him to return to his own table. The courtroom security officer ("CSO") instructed Plaintiff to remain seated at his table and to not engage with opposing counsel. *Id*. at 5. The CSO noted the smell of alcohol on Plaintiff's person. *Id*. at 14. Additional courtroom security personnel were summoned to the courtroom to assist in maintaining order.

After the case was called at 9:09 A.M., the following exchange occurred:

> Plaintiff:       My head is still bleeding from the attack last night. I noted in my initial complaint that I felt that I had a target on my back as a result of filing this case. Last night it just so happens I was attacked on Water Street. I spent the night in the ER. And I'm still bleeding right now at this very moment. You can take that as you will, you'll say it's just a random circumstance. Just like Mitchell lying on your witness stand and you condoning it. You not saying, yes, let's look at that evidence to prove that he's fricking lying. But you did not. So do what you will with this, hold me in contempt. I don't care. But this is wrong and this is definitely related to this case.

| | |
|---|---|
| The Court: | Thank you, Mr. Froemming. You're entitled to your views, and we're ready to proceed with the jury. Mr. Decker, Miss Monti, do you have any additional evidence beyond the stipulation that we addressed at the close yesterday? |
| Plaintiff: | I would like the trial to be delayed as I am still bleeding at this point. I'm in a medical situation that does not condone me sitting here in a courtroom. Thank you. |
| Attorney Monti: | I'm not sure how he was discharged from the E.R. in this state. |
| The Court: | I'm sorry? |
| Attorney Monti: | I'm curious how he was discharged from the E.R. in this state then. |
| The Court: | We're ready to proceed. |
| Attorney Monti: | Correct. |
| Plaintiff: | Do you want to see my discharge papers? |
| [. . .] | |
| The Court: | No, Mr. Froemming, nobody— |
| Plaintiff: | You didn't believe I had a heart attack, so here you go. There's the paperwork.[3] |
| CSO: | I've asked you once not to approach that table at all. Okay? |
| The Court: | Do you have the stipulation? |
| Attorney Monti: | I do have the stipulation. |
| [. . .] | |

---

[3]At this point, Plaintiff stood up, approached Attorneys Monti and Decker, and tossed his discharge paperwork at them.

Case 2:19-cv-00996-JPS   Filed 06/14/23   Page 11 of 42   Document 73

| | |
|---|---|
| The Court: | We'll invite the jury in, and you can read the stipulation as to the— |
| Plaintiff: | Your Honor, I have not had a chance to respond to this stipulation because I spent the night in the ER. I refuse to let the jury hear this without me being able to respond to this stipulation. |
| The Court: | Fine. Read it. Read it now, Miss Monti. |
| Monti: | Yes. |
| Plaintiff: | I'm not going to try and legally decipher this and look up the associated legal code that—that you made a ruling on based on this. I'm—I've spent the night in the ER. I am bleeding right now. I do not have time or the energy to address legal matters at this point because of medical emergencies. Thank you for addressing that situation. |
| The Court: | It's been addressed, you're here, and we're going to proceed, Mr. Froemming. |
| Attorney Monti: | This is the— |
| Plaintiff: | We're going to proceed? Even though I'm still bleeding here in the courtroom? |
| The Court: | Yes. We're going to proceed. |
| Plaintiff: | That's fabulous. |
| [. . .] | |
| Plaintiff: | Do you really want me to proceed with the situation today while I'm still bleeding? Is that a proper way to run a courtroom? |
| The Court: | It's your day in court, Mr. Froemming. |

| | |
|---|---|
| Plaintiff: | And I have a medical emergency. I am bleeding. |
| Attorney Monti: | And just— |
| The Court: | I don't see it that way. |
| Plaintiff: | You don't see it that way? You don't see this blood coming off my— |
| The Court: | We're going to proceed. You should be concentrating on your— |
| Plaintiff: | You should be concentrating on my safety. And you are not. Go ahead, hold me in contempt. Maybe I'll get some medical attention. |
| The Court: | You may invite the jurors in. |
| Attorney Monti: | Judge, I just want to address one more issue. I don't want him to be able to discuss this matter to the jury because it has nothing to do with this trial. |
| The Court: | That's the jury's determination. He can talk about whatever he would like. |
| Plaintiff: | This is ridiculous. To think that you want me to proceed while I'm sitting here in your courtroom bleeding is unconscionable. |
| The Court: | And your conduct is even more unconscionable. |
| Plaintiff: | The fact that I'm bleeding in your courtroom? |
| The Court: | No, the manner in which you discussed matters with counsel and the court staff, coming into the courtroom yelling like a raving maniac. |
| CSO: | All rise. |

| | |
|---|---|
| The Court: | Good morning, members of the jury. We're ready to proceed, and I believe counsel for the defendants— |
| Plaintiff: | Your Honor, I would like to file a motion for a mistrial—for a mistrial. |
| The Court: | You're out of order, Mr. Froemming. Miss Monti, you may put your comments on the record with regard to the stipulation and the movement of the two video exhibits. |
| [. . .] | |
| The Court: | Thank you. Members of the jury, the Court does— |
| Plaintiff: | I don't get to respond? |
| The Court: | Certainly. Do you have any additional evidence? |
| Plaintiff: | I don't have any additional evidence . . . . [S]he's lying once again in this document as she has lied in many other documents throughout this proceedings [sic]. And I'm bleeding here in court, yet you want to proceed. I was attacked last night, I—when I filed this case, I said I fear for my life and my safety, last night I was attacked. I spent the night in the ER, I am still bleeding, yet he wants to proceed. |
| The Court: | Members of the jury, you're instructed to disregard Mr. Froemming's comments. |
| [. . .] | |
| Plaintiff: | Your Honor, I ask that this trial be paused until I stop bleeding. |
| The Court: | Members of the jury, I'm going to excuse you, and we're going to next address the jury instructions and verdict form that |

> will guide you during your
> deliberations. . . .

ECF No. 63 at 3–13. At this point, Plaintiff stood up and began gathering his belongings. He began to exit the courtroom.

The Court: Mr. Froemming, if you are going to leave the courtroom, you are subject to—

Plaintiff: I'm leaving due to a medical emergency, Your Honor. The fact that you don't want to recognize it is not my issue. We'll resume when my medical emergency has abated. Thank you, Your Honor.

(Mr. Froemming left the courtroom at 9:24 a.m.)

*Id.* at 13. At 9:30, the Court reconvened with Attorneys Decker and Monti outside of the presence of the jury. Plaintiff remained absent.

The Court: Let the record reflect that we have reconvened in the matter of William Froemming versus Lete Carlson, et al. Our first purpose is to make a little bit more of a record beyond what occurred in open court. Mr. Froemming threw some medical records at the defense table, which have now been turned over to the Court. Mr. Froemming appears from the record to have received medical attention earlier today at Froedtert. He was discharged with pain medication and at about 7:23, as I recall. How the events that caused his need for medical attention [occurred] is unclear.

Our CSO reports that he had noticeable alcohol smell here in the courtroom this morning, so I'm not sure whether he had spent the evening drinking or drinking at his hotel room. What the mechanism was for the injury I'm not certain, but he did

present himself in a very argumentative manner, almost a repeat of what the officers testified as to his demeanor back on July 14th of 2016, and he's obviously a very disturbed individual and extremely argumentative.

But given the fact that this is a civil case, there is no mandatory requirement that he be here as far as the Court is concerned, he's waived his appearance, and although he certainly was free to argue his case to the jury, he chose a different path, but I find absolutely no basis in fact or law to suggest that this case not go forward to conclusion. And so we're at that point.

[. . .]

This is not a complicated case, and since the jury has taken the time to be present and since the Court is ready to instruct the jury and counsel for the city prepared to argue, we're going to proceed, finding that Mr. Froemming has waived his right to further participate in the trial, notwithstanding his protestations because his protestations were not bona fide. What he did last evening and the dynamic of falling victim to having been beat up, whether in a barroom brawl or somewhere else, that's an entirely different subject, but there's nothing before the Court other than his rants to suggest that this case somehow be delayed. Mr. Decker and Miss Monti, do either of you have any requests with respect to the jury instructions?

| Attorney Monti: | I just, to add a little . . . detail to your record before about what happened earlier, I just wanted to have it noted for the record that Mr. Froemming left the court at 9:25 and has not returned. |
|---|---|

*Id*. at 14–17. Thereafter, the jury returned to the courtroom and received its instructions. Plaintiff did not return to court at any point.

### 2.3    Evening of February 13 to Morning of February 14

Having recounted what occurred in court during trial, the Court next turns its attention to an investigation conducted by the Milwaukee Police Department to provide a timeline of Plaintiff's activities and what actually occurred during the evening of February 13, 2023, and early morning hours of February 14, 2023. This investigation was predicated upon Plaintiff's allegations of having been attacked and that Defendants were responsible. The results of this investigation were provided to Attorneys Monti and Decker, who, in turn, provided the findings to Plaintiff and the Court. The investigation included multiple video surveillance clips ("the Compilation Video")[4] drawn from security cameras positioned at various locations, which when taken together provide confirmation that Plaintiff's accusations and representations about what had occurred were not only not "bona fide," *id*. at 15, but rather were patently and egregiously false.

On February 13, 2023, the first day of trial concluded shortly after 5:00 P.M. ECF No. 57 at 7. Plaintiff's activities during the ensuing two hours are unknown. However, security footage from The Pfister Hotel (the "Pfister"), a premier hotel at which Plaintiff stayed, shows Plaintiff

---

[4]Plaintiff appears to have been staying on the 16th floor. Compilation Video at 01:09. The Compilation Video, marked as Exhibit 1-2.13-14, may be viewed at https://player.piksel.tech/v/c7lw254v.

standing in the 16th floor elevator lobby at 7:23 P.M.[5] ECF No. 65-5 at 1. He approaches the elevator wearing a distinctive red shirt. *Id.* At 7:26 P.M., Plaintiff exits the elevator into the first-floor lobby. *Id*. at 2. Plaintiff later informed police that he was leaving at that time to go to dinner at The Mason Street Grill, which is located on the hotel property. Compilation Video at 00:29. Plaintiff then informed the officers that he remained at the restaurant until about 10:30 P.M. *Id*. at 00:39.

Indeed, security footage shows that Plaintiff returned to the first-floor elevator lobby at 10:30 P.M. ECF No. 65-5 at 3. At 10:32 P.M., the footage shows Plaintiff in the elevator lobby on the 23rd floor where the Pfister's Blu Martini Bar is located. *Id* at 4. The bar apparently closes at midnight. Compilation Video at 00:47–00:53.

Security footage shows Plaintiff again at the elevator lobby on the 23rd floor at 12:14 A.M. ECF No. 65-5 at 5, 6. He summons the elevator. Then, at 12:16 A.M., he appears on the 16th floor in a long white coat. *Id*. at 7. A minute later, Plaintiff exits the elevator on the first floor, dressed in his long white coat and sporting a pair of sunglasses. *Id*. at 8. Plaintiff then exits the hotel through its Jefferson Street entrance. *Id*. at 9.

At 12:19 A.M., Plaintiff can be seen standing on the sidewalk under the Pfister's iconic red awning. Compilation Video at 01:36. He crosses Jefferson Street heading east. *Id*. at 01:41. At 12:25 A.M., security footage at the corner of Mason and Jefferson Streets shows Plaintiff on the sidewalk outside the SportClub. *Id*. at 02:10; *see also* ECF 65-6 at 1 (map indicating Plaintiff's route). Shortly thereafter, Plaintiff crosses the street and is not

---

[5]Plaintiff appears to have been staying on the 16th floor. Compilation Video at 01:09.

Case 2:19-cv-00996-JPS   Filed 06/14/23   Page 18 of 42   Document 73

seen again on security footage until nearly 2:00 A.M. Compilation Video at 02:39.

At 1:58 A.M., Plaintiff reappears in footage captured along Jefferson Street. *Id.* at 02:46. He travels southbound and then, upon reaching the intersection, pauses and appears to reconsider his direction. *Id.* at 02:47–03:25. Several minutes later, surveillance footage shows Plaintiff standing for an extended period outside the Milwaukee Athletic Club located at 758 North Broadway. *Id.* at 03:41–04:37. He appears to be sleeping while remaining upright and leaning against the side of the building. He remained in this location for approximately 45 minutes, from 2:02 A.M. to 2:44 A.M. Plaintiff then stumbles along the sidewalk, appearing significantly intoxicated. *Id.* at 04:51. He at one point exits the frame of the security footage but several minutes later returns. *Id.* at 05:06.



Video Image of Froemming standing outside the Milwaukee Athletic Club

At approximately 2:48 A.M., Plaintiff crosses the street and walks into the open doorway of the BMO Harris Tower parking garage located at 771 North Broadway. *Id*. at 05:20–05:33; *see also* ECF No. 65-6 at 1 (showing location of the BMO Harris Tower on the map and Plaintiff's path thereto and therefrom). Several minutes later, footage shows Plaintiff stumble out of the doorway, where he falls to the sidewalk.



Video Image of Froemming on the sidewalk outside BMO Harris parking garage

Compilation Video at 05:38. He struggles back to his feet and then continues on his way. He continues to sway and stumble, leaning up against the exterior wall of the parking garage before proceeding. *Id*. at 06:06–06:29.

For several minutes, Plaintiff wanders aimlessly around the area surrounding the parking garage. *Id*. at 06:30–06:46. He reenters the open doorway of the garage, retreats again, and then goes back in through the vehicle entrance. *Id*. at 06:48–07:04. At this point, Plaintiff can be seen near the kiosk ticket dispenser where vehicles pull into the garage.

Beginning at about 2:54 A.M., Plaintiff supports himself on the kiosk. *Id*. at 07:09. He remains there, apparently sleeping or resting standing up, until 3:28 A.M. *Id*. at 07:50.



Video image of Froemming standing at BMO Harris parking garage Kiosk

At 3:28 A.M., Plaintiff suddenly falls backward. *Id*. at 07:55. Plaintiff has his sunglasses on the back of his head, and the back of his head strikes the elevated concrete lane divider supporting the ticket kiosk. *Id*. Plaintiff remains there for several moments, appearing disoriented. *Id*. at 08:28. He then comes to a seated position, and the broken pieces of Plaintiff's sunglasses can be seen on the concrete. *Id.* at 08:38.


Video Image of Froemming following fall at BMO Harris parking garage entrance

Plaintiff struggles for another minute or so to get to his feet. He then walks a few paces and, with his back to the camera, urinates in the corner. *Id.* at 09:30–10:33. Plaintiff then exits the garage and leans for some time on the exterior of the building. *Id.* at 10:47. Plaintiff continues to wander in and out of the garage entry without any clear purpose. *Id.* at 11:04.

At 4:05 A.M., while standing outside the same parking garage at the southwest corner of North Broadway and Wells Streets, Plaintiff falls again. *Id.* at 12:32.

Case 2:19-cv-00996-JPS   Filed 06/14/23   Page 22 of 42   Document 73



Video Image of Froemming outside the BMO Harris parking garage on the corner of Broadway and Wells Streets

He sits on the sidewalk for a minute before returning to his feet. He then rounds the corner and continues to lean against the building. *Id*. at 13:00. Around 4:08 A.M., he stumbles significantly and nearly falls again. As he gets closer to the security camera, blood can be seen on his head. *Id*. at 13:24. By 4:10 A.M., Plaintiff leaves the area of the BMO Harris Tower and makes his way down the sidewalk. *Id*. at 13:56–14:32. No attack or beating occurs at any point.

Footage from a security camera located three blocks to the south captures Plaintiff next standing near the curb at the intersection of North Broadway and Michigan Streets. *Id*. at 14:57. A vehicle pulls over, and the driver exits and approaches Plaintiff. *Id*. at 15:05. At 4:38 A.M., the driver is seen standing on the corner with Plaintiff. *Id.* at 15:11. The driver calls 911 and reports that he's got "an individual here that's standing on the corner that's just dripping blood from his head." *Id*. at 15:09–15:35. The driver asks Plaintiff if he was assaulted or if he fell. *Id*. at 16:59. Plaintiff responds no,

and that he doesn't know what happened. *Id*. at 17:01. The driver agrees to stay on scene until assistance arrives. Plaintiff can continue to be heard in the background, distraught, panicking, and apologizing to the driver. *Id.* at 17:28. Milwaukee police, a fire department unit, and an ambulance respond to the scene.

The Milwaukee Police Department's investigation further reflects that a report was taken from the 911 caller at 4:38 A.M. on February 14, 2023. ECF No. 65-2 at 1–2. The individual reported that he was driving by when Plaintiff flagged him down. *Id*. at 2. Police reported to the scene and observed Plaintiff "bleeding from the top of his head" with "dry blood that dripped down his face and swelling to the left side of his cheek." *Id*. The police report details that Plaintiff was "extremely argumentative and lunging towards" officers who "were trying to treat him." *Id*. Plaintiff was "unable to keep a steady balance as when he tried to stand up he fell back down to the ground, had slurred speech, and an odor of alcohol emitting from his breath." *Id.*

A responding officer's body camera footage, beginning at 4:52 A.M., confirms these details. Compilation Video at 22:54. This footage demonstrates that Plaintiff's demeanor made a 180-degree transformation from when he was heard in the background of the 911 call just 15 minutes earlier. Plaintiff switches from distraught and apologetic to irate and belligerent.

| Personnel: | You need to sit down, sir. |
|---|---|
| Plaintiff: | Don't talk to me like that. |
| Officer: | Hey. |
| Plaintiff: | You fuckin' think I fuckin' did something wrong? |

Case 2:19-cv-00996-JPS   Filed 06/14/23   Page 24 of 42   Document 73

| | |
|---|---|
| Personnel: | Have a seat. |
| Officer: | [grabs Plaintiff's arm] |
| | Stop. |
| Plaintiff: | Don't even fuckin' push me, when I'm fuckin' injured. |
| Officer: | Hey. |
| Plaintiff: | You fuckin' wanna push me when I'm injured? You're fuckin' liable, bitch. |
| Officer: | Do you need medical yes or no? |
| Plaintiff: | I didn't do anything wrong. |
| Officer: | You guys know what happened? |
| [. . .] | |
| Plaintiff: | I'm gonna get on my knees right now, and I'm gonna tell you that I did nothing wrong. I fucking did nothing wrong. |



Video Image from Compilation Video at 23:43

| | |
|---|---|
| Personnel: | I didn't say you did. |
| Plaintiff: | No, but you pushed me. I was fuckin' injured. And I was wronged. |
| Personnel: | I did not push you. |
| Plaintiff: | Yes, you did. |
| Officer: | Hey, where were you coming from? |
| Plaintiff: | I have no fucking idea. |
| Officer: | Where were you going to? |
| Plaintiff: | I have no idea. |
| Officer: | Do you have any ID on you? |

Case 2:19-cv-00996-JPS   Filed 06/14/23   Page 26 of 42   Document 73

[Plaintiff identifies self and sarcastically provides social security number]

| Plaintiff: | Do you need more? |
|---|---|
| Officer: | No. |

[. . .]

| Plaintiff: | What the fuck happened? What the fuck happened here?[6] |
| Officer: | Um, where do you live at? |
| Plaintiff: | What do you—what? |
| Officer: | What's your address? |
| Plaintiff: | I just told you. [provides address]. Did you not hear it the first time?[7] |
| Officer: | No, I didn't, I'm sorry. |
| | What's a good phone number for you sir? |
| Plaintiff: | [Begins yelping, hyperventilating, and panicking] |

*Id*. at 23:00–26:30.

An EMT attempts to hand Plaintiff his ID and documents and tells him to keep them in his pocket while another individual informs Plaintiff they will be transporting him to the hospital. Plaintiff does not initially respond and instead mutters incoherently and breathes heavily. *Id*. at 27:00–27:07. Then he shouts, "Fuck you!" *Id*. at 27:08. He continues yelling obscenities and spits out, "[d]oes it look like I can put something in my pocket right now?" *Id*. at 27:20. He continues to assume that he is being accused of wrongdoing and yells at responding personnel.

---

[6]Plaintiff at no point suggests to the responding personnel that he was attacked or beaten.

[7]The body camera footage shows that Plaintiff had not yet recounted his address.


Video image of Compilation Video at 27:51

Plaintiff continues to berate the responding officers and EMTs. An EMT asks Plaintiff, "what happened today?" *Id*. at 18:20. "I have no fuckin' clue what happened today," Plaintiff responds. *Id*. at 18:22. Once Plaintiff is loaded into the ambulance to be transported to the hospital, the remaining responding personnel and officers express incredulity at Plaintiff's behavior. *Id*. at 29:05.

Plaintiff was transported to Froedtert Hospital, where he was admitted at 6:06 A.M. ECF No. 65-2 at 3. The police report provides that "[w]hile at the hospital [Plaintiff] stated he was still unaware of the events that took place" that day. *Id*. He stated that he "was drinking earlier in the day but could not remember" details about how he arrived at the scene that morning. *Id*. Plaintiff was discharged from the Froedtert emergency room about an hour and a half later.

Footage from the Pfister shows that Plaintiff returned to the hotel around 7:57 A.M. Compilation Video at 29:33. He can be seen in the 16th floor elevator lobby in his long white coat. ECF No. 65-5 at 10.[8] Thereafter, he left the Pfister, crossed the street, and went to the Federal Courthouse where he conducted himself as earlier described.

Following his departure from the courtroom at approximately 9:24 A.M. on February 14, Plaintiff returned to the Pfister. Shortly thereafter, the head of security called police on Plaintiff's behalf. Compilation Video at 32:30; ECF No. 65-3. In the 911 call, the head of security describes that he has "a guest" who says he was "assaulted last night." Compilation Video at 32:40. The 911 operator asks if police responded to this alleged assault at the time that it occurred. The head of security noted that Plaintiff was "still, um, a little under the weather from the alcohol" so Plaintiff was not entirely sure what happened. *Id.* at 33:00. The Milwaukee Police Department dispatched officers to the Pfister to speak with Plaintiff.

Plaintiff described to the responding officers that he believed he had been attacked the night prior in retaliation for his lawsuit. *Id.* at 34:40–34:50.

---

[8]Officers spoke with the head of security at the Pfister, who described an interaction he had with Plaintiff at around 8:00 A.M. on the morning of February 14, 2023. Compilation Video at 29:38. The head of security described that Plaintiff appeared to be still drunk when he returned to the hotel that morning. *Id.* at 29:50. Plaintiff was described as having an "unsteady gait" and an odor of alcohol that made the witness "nauseous." *Id.*

The Pfister head of security recounts hearing Plaintiff on a phone call the morning of February 14, 2023, saying "if I wind up dead, you know who did it." *Id.* at 30:48. When the head of security inquired further, expressing concern as to Plaintiff's safety, Plaintiff told him that it was "no fucking coincidence that [he] testified" against the West Allis Police Department and then got "attacked." *Id.* at 31:03. Plaintiff informed the head of security that he had not reported this alleged attack to police and that he had to get to court. *Id.* at 31:28. The head of security described Plaintiff as a "hothead." *Id.* at 32:12.

He further told them that belongings that had allegedly been neatly placed on his bed were "all over the floor" by the time he came back to the room. *Id*. at 34:55. He insisted that someone had been in his hotel room and that he was "beaten" the night prior. *Id*. at 35:00.

The responding officers asked Plaintiff if he wanted to call for medical help after Plaintiff described how his head wound had been bleeding for several hours. *Id.* at 35:53. Plaintiff initially declined. *Id*. at 36:08. He informed the officers that the "reason [they] are [there] is not to call medical." *Id.* at 36:10. Eventually, he allowed medical personnel to examine him in his hotel room, and only after the officers' insistence.

### 3. LAW & ANALYSIS

#### 3.1 Mistrial

A court may declare a mistrial if it determines that such a declaration is "occasioned by manifest necessity." *United States v. Taylor*, 569 F.3d 742, 746 (7th Cir. 2009) (quoting *United States v. Combs*, 222 F.3d 353, 358–59 (7th Cir. 2000)). "A mistrial is manifestly necessary only if the scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings." *Id*. (internal citation and quotation marks omitted).

Generally, a mistrial is appropriate only when "an event during trial has a real likelihood of preventing a jury from evaluating the evidence fairly and accurately, so that the defendant has been deprived of a fair trial." *United States v. Collins*, 604 F.3d 481, 489 (7th Cir. 2010). A mistrial in a civil case is appropriate when improper conduct "consistently permeated the entire trial from beginning to end." *Jimkoski v. State Farm Mut. Auto. Ins. Co.*, 247 F. App'x 654, 662 (6th Cir. 2007) (quoting *Sutkiewicz v. Monroe Cnty. Sheriff*, 110 F.3d 352, 361 (6th Cir 1997)). As a result, a mistrial "on the basis

of a single episode" is rare. *Id*. (quoting *Beck v. Haik*, 377 F.3d 624, 642–43 (6th Cir. 2004)).

A mistrial is not warranted here because the Court cannot conclude that "the ends of public justice would not be served by a continuation of the proceedings." *Taylor*, 569 at 746. To the contrary, the ends of public justice demand that this case conclude. Nor can the Court conclude that Plaintiff's outbursts and demeanor in trial, as well as the Court's decision to proceed notwithstanding Plaintiff's protestations, had any "real likelihood of preventing" the jury from evaluating Plaintiff's case fairly and accurately. *Collins*, 604 F.3d at 489.

Plaintiff made serious, patently false assertions to the Court on February 14, 2023. He endeavored to convince the Court, and the jury, that he was the victim in a violent plot against him. He claimed to have been attacked and beaten, which was not correct. He claimed to have been attacked in an assault specifically orchestrated by Defendants and by Attorneys Decker and Monti, which was not correct. He claimed to have spent the night in the Froedtert Hospital emergency room, which was not correct. He accused Defendants and their counsel of very serious criminal conduct. He continues to make these assertions in his filings. ECF No. 59. None of these assertions were or are supported by any semblance of fact or reality whatsoever. Plaintiff had no legitimate, rational reason to proffer these assertions. They were based entirely on delusion and fabrication.

What occurred on the evening of February 13, 2023 into the following morning was no one's fault but Plaintiff's own. Plaintiff concluded the first day of his jury trial and proceeded to become severely intoxicated. That intoxication was so significant that it continued into the following day. This intoxication led to Plaintiff's injuries. Video evidence

renders that conclusion indisputable. And when police and other personnel responded to assist Plaintiff, in his time of need, he assumed the same demeanor exhibited on July 14, 2016. He responded to police—who were ensuring his well-being—with contempt, hostility, belligerence, and aggression. He assumed automatically in each scenario that the law enforcement officer with whom he was interacting was out to get him. And in each case, the officer continued to interact with Plaintiff in a diplomatic, professional manner, notwithstanding the barrage of obscenities and misplaced anger that Plaintiff directed towards them.

In each instance, Plaintiff insisted he did nothing wrong, when in fact, the evidence showed quite the opposite. In July 2016, he was encountered in a vehicle suspected to be running, smelling of alcohol and with marijuana and drug paraphernalia. And in February 2023, he was encountered publicly intoxicated, conducting himself in a manner that the adverb "disorderly" does not begin to adequately describe. At every turn, Plaintiff refused, or perhaps was unable, to acknowledge that he was, in fact, at fault, and not the target of a retribution plot by law enforcement.

Plaintiff concluded his case in chief on February 13, 2023, well before the alleged attack ever occurred and well before he ever barged into the courtroom, still intoxicated, and presenting himself like a "raving maniac." ECF No. 63 at 8. He presented all the evidence he wished to present to the jury on February 13, 2023. The defense presented no case in chief of its own, relying solely on the inadequacies of Plaintiff's case. The jury was simply not interested in buying what Plaintiff was attempting to sell; underscored by the jury's return of a verdict in favor of Defendants after less than an hour of deliberation. Plaintiff has not demonstrated that the same verdict would not have been reached had Plaintiff not behaved as he did on

February 14, 2023, and had he not made a unilateral departure from his own trial. In any event, Plaintiff has no one to blame but himself for his in-court demeanor. *See* 1 MOORE'S ANSWER GUIDE: FED. CIV. MOTION PRAC. § 12:18 at [4] ("The misconduct of a party . . . rarely justifies a new trial. Courts have held that crying and other emotional outbursts do not automatically provide grounds for a new trial.") (internal citations omitted).

Plaintiff received medical treatment, was discharged, came to court, and refused to remain to provide his closing statement. That choice was his own, and he was free to make it. *See McGill v. Duckworth*, 944 F.2d 344, 353 (7th Cir. 1991) ("Persons need not attend the proceedings just because they have been named as parties . . . ."); *United States v. Yaughn*, 493 F.2d 441, 445 (5th Cir. 1974) ("[The] closing argument is usually considered to be a right of the party carrying the affirmative of the issue or issues involved . . . The right to close, as well as the right to open the argument may be waived.") (citation omitted); *United States v. Lopez*, No. 2:16-cr-00157-KJM-1, 2017 U.S. Dist. LEXIS 142340, at *17 (E.D. Cal. Aug. 30, 2017) ("[A] defendant's silence in the face of an opportunity to present a closing argument reflect[s] nothing more than his voluntary relinquishment of that right.") (internal citation omitted).

Nor did the Court err in denying Plaintiff's request to put the trial on hold. "Whether to grant or deny a motion for continuance is left to the broad discretion of the trial court." *Brown v. City of Fort Wayne*, No. No. 1:09-cv-150, 2012 U.S. Dist. LEXIS 76292, at *2 (N.D. Ind. May 31, 2012) (citations omitted). It is reasonable to conclude that were Plaintiff still in the grips of a bona fide medical emergency, he likely would not have been quickly discharged from the emergency room by medical professionals earlier that morning. And the Court recognized, based on its extensive experience and

interactions with Plaintiff, including a familiarity with Plaintiff's history of obfuscation and prevarication, that Plaintiff's protestations and allegations were not bona fide. The Court accordingly declined Plaintiff's requests to put trial on pause. It was within the discretion of the Court to proceed in Plaintiff's absence. *See Moffitt v. Ill. State Bd. of Educ.*, 236 F.3d 868, 875–76 (7th Cir. 2001) ("[W]e will not simply assume that it [is] impossible to go forward in the plaintiff's absence."). Were the Court to conclude otherwise, a plaintiff who realizes his trial is not going the way he expected could inflict injury upon himself or throw a tantrum in front of the jury to buy himself more time and avoid an inevitable conclusion.

Plaintiff insists that he "exited the courtroom to attend to [his] medical needs," but he did no such thing. ECF No. 59 at 3. He went back to his hotel to attempt to create a factually false record of what occurred the night prior. Police were summoned to his hotel room for the sole purpose of taking a report. Plaintiff's motivation was demonstrably unrelated to obtaining medical care. Plaintiff expressed to police and to hotel staff no desire or need to call an ambulance, return to the hospital, or otherwise receive first aid. To the contrary, he initially declined such an offer from police shortly after leaving the courtroom, telling them that they weren't there to offer him medical care but rather just to take his report.

The Court similarly dismisses Plaintiff's second proffered justification for a mistrial. Plaintiff claims that a mistrial is warranted because Chief Mitchell was allowed to present a "provable lie" to the jury. ECF No. 59 at 2. Plaintiff alleges that Chief Mitchell lied on direct examination regarding a response letter that Chief Mitchell previously sent to Plaintiff. Plaintiff also claims that he requested that "the court review this document to see that this witness was lying under oath" and that the Court

Case 2:19-cv-00996-JPS   Filed 06/14/23   Page 34 of 42   Document 73

"declined to review such document." *Id*. Plaintiff's characterizations of these events are belied by the record (a consistent occurrence in this litigation).

Nothing that occurred during this exchange on direct examination presents grounds for a mistrial. To the contrary, the Court overruled multiple objections from the defense during this exchange, which allowed Plaintiff to continue the line of questioning. At a certain point, the Court felt that the exchange had gone on long enough. Plaintiff claims that defense counsel objected to production of the document and that the Court sustained it, but that is not accurate. The Court overruled two objections regarding *other documents*, and then sustained one objection based on Plaintiff's argumentative questioning. Plaintiff has presented no legitimate basis for a mistrial, and his motion will be denied.

### 3.2    Sanctions

Defendants have additionally filed two motions for sanctions against Plaintiff. ECF Nos. 66, 67. The grounds for such motions are as follows:

- Plaintiff's policy and practice claims do not meet the requirements of Federal Rule of Civil Procedure 11(b), which requires representations to the Court to have evidentiary support or be likely to have evidentiary support after discovery. ECF No. 66 at 4.

- Plaintiff was never able to provide evidentiary support for any series of bad acts giving rise to *Monell* liability. *Id*. at 5–7.

- Plaintiff insisted that he did not need to show a pattern at all. *Id*. (citing ECF No. 35-1 at 4) ("I do NOT believe this is necessary to show that the other defendants' violations need to be proven as a pattern, as those statute and policy violations on their own are what violated my civil rights."). In other words, Plaintiff should be sanctioned for

refusing to accept the requirements of *Monell* and for continuing to pursue such claims. *Id*. at 6.

- Plaintiff's motion to disqualify defense counsel and the assertions made therein also do not meet the requirements of Rule 11(b). *Id*. at 8. Specifically, that motion was "factually unfounded and defamatory" and was filed to "harass." *Id*. at 9–10.

- Plaintiff's attempts at interlocutory appeal were without "credible legal basis." *Id*. at 10.

- Plaintiff's requests for a mistrial lack legitimate legal and factual basis. ECF No. 67 at 4–5.

Defendants request that Plaintiff be "enjoined from further abuse of process." *Id*. at 8. "Plaintiff does not have the right to file frivolous motions, pursue meritless arguments, harass opposing counsel, or attempt to repeatedly and relentlessly relitigate the same matters through municipal, state, and now federal court." *Id*.

Courts may sanction pro se litigants pursuant to Rule 11. *See Vukadinovich v. McCarthy*, 901 F.2d 1439, 1445 (7th Cir. 1990) ("Status as a pro se litigant may be taken into account, but sanctions can be imposed for any suit that is frivolous."). A "district court may not decline to impose any sanction when a violation has arguably occurred simply because a plaintiff is proceeding pro se." 1 FEDERAL LITIGATION GUIDE § 8A.04.

In addition to the authority to impose sanctions listed in Rule 11, a court retains the "inherent power to impose sanctions." *Mach v. Will Cnty. Sheriff*, 580 F.3d 495, 502 (7th Cir. 2009) (quoting *Method Elecs., Inc. v. Adam Techs., Inc.*, 371 F.3d 923, 927 (7th Cir. 2004)). "Inherent power" describes "the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." 2 MOORE'S FEDERAL PRACTICE—CIVIL § 16.90. "This authority includes more than the

power to impose silence, respect, and decorum in the court's presence, and submission to its lawful mandates . . . ." *Id.* A court can impose sanctions pursuant to its inherent power "where a party has willfully abused the judicial process or otherwise conducted litigation in bad faith." *Tucker v. Williams*, 682 F.3d 654, 661–62 (7th Cir. 2012).

As described below, the Court finds Plaintiff's trial-related behavior more egregious than his pre-trial behavior. The Court will accordingly deny Defendants' first motion for sanctions, ECF No. 66, which appears to be based solely in Plaintiff's pre-trial conduct. But the Court agrees that sanctions pursuant to the Court's inherent authority are appropriate here with respect to Plaintiff's trial-related conduct, and so the Court will grant in part Defendants' second motion for sanctions, ECF No. 67.

Plaintiff is untrained in the law. The Court does not fault him for failing to grasp its intricacies. The Court does, however, take exception to Plaintiff repeatedly disparaging opposing counsel without foundation, misrepresenting events, demonstrating a lack of decorum and civility, and needlessly and baselessly delaying proceedings over the course of this litigation. These are the sorts of behaviors that cannot be excused by one's pro se status. Even affording Plaintiff leeway by virtue of his pro se status still leaves the Court with the unmistakable conclusion that Plaintiff's behavior is sanctionable. *See* 2 MOORE'S FEDERAL PRACTICE – CIVIL § 11.23 ("Although the absence of legal advice is an appropriate factor to be considered in determining the nature and severity of sanctions to be imposed, there are limits to the courts' indulgence towards pro se litigants.").

The Court may validly consider what degree of sanction is "needed to deter similar activity by other litigants" and is needed "given the

financial resources of the responsible person, . . . to deter that person from repetition in the same case." *Id*. Despite the Court's admonitions regarding Plaintiff's behavior,[9] the message has not, apparently, sunk in. Some significant sanction is therefore appropriate.

The Court will assess against Plaintiff the cost incurred for empaneling the jury for trial. Plaintiff unilaterally decided to leave his trial the morning of its second day. He did so after baselessly accusing opposing counsel of criminal conduct and interrupting the Court's remarks to the jury. This is an extremely inappropriate use of the federal judicial forum and its resources. Moreover, Plaintiff's conduct, both in and out of the courtroom, demonstrates a complete lack of appreciation for the jury's time, efforts, and contributions as a whole. *See United States v. Dowell,* 257 F.3d 694, 700–01 (7th Cir. 2001) (affirming as proper sanction of reimbursing the court for cost of empaneling the jury); *United States v. Claros,* 17 F.3d 1041, 1046–47 & n.4 (7th Cir. 1994) (court may order counsel to pay jury costs as sanction for negligent failure to timely appear at trial); *see also Lasar v. Ford Motor Co.,* 399 F.3d 1101, 1104–05 (9th Cir. 2005) (affirming sanction "intended to . . . reimburse the district court for the costs of empaneling the jury"); *Jones v. Bd. of Educ.,* No. 84-0455, 1985 U.S. Dist. LEXIS 21240, at *13

---

[9] *See* ECF No. 63 at 8 ("You're out of order, Mr. Froemming."); ECF No. 49 at 2 (denying Plaintiff's motion for disqualification of opposing counsel as "lacking in both law and fact"); ECF No. 51 at 8 (noting that there was "scant, if any, evidence of any policy" for purposes of Plaintiff's *Monell* claims) and at 11 (noting that Plaintiff's discovery request would have been more appropriate "about 18 to 24 months ago" and that, in any event, "there is absolutely not a shred of any significant likelihood that [it] would bear any fruit"); and ECF No. 55 at 10–11 (noting that Plaintiff's motion for certification for interlocutory appeal served to list Plaintiff's grievances rather than identify any controlling issue of law).

(E.D. Pa. Mar. 29, 1985) ("Another potential sanction available to assess against counsel is the cost of needlessly impaneling the jury.").

Assembling a jury for trial is a significant endeavor, requiring the participation and collaboration of many actors beyond the jury members themselves. Moreover, "federal taxpayers foot the bill" for this endeavor. *Dowell*, 257 F.3d at 701. The Court will not allow Plaintiff to burden the federal judiciary and the taxpayers by disregarding the significance of the jury. The Clerk of the Court has determined that the cost incurred to empanel the jury in this case is $1,118.18.

The Court will additionally order Plaintiff to reimburse defense counsel for their reasonable attorneys' fees and costs in responding to the written motion for a mistrial.[10] Attorneys Decker and Monti, and likely

---

[10]Should Plaintiff elect to file an appeal in this matter, Plaintiff must post a bond or the cash equivalent of the sanction (*i.e.*, Defendants' reasonable attorneys' fees, and costs incurred with respect to their response to Plaintiff's motion for a mistrial); the cost of having empaneled the jury; and Defendants' costs in this action as may be taxed by the Clerk of the Court.

The decision to require a plaintiff to post a bond is within the discretion of the court. "No statute or rule, or decision of this circuit, expressly authorizes a court to require the posting of a bond to secure the payment of costs to a party should he prevail in the case." *Anderson v. Steers, Sullivan, McNamar & Rogers*, 998 F.2d 495, 496 (7th Cir. 1993). However, this authority is inherent in the power to award costs to a prevailing party. *Id.; Gay v. Chandra*, 682 F.3d 590, 594 (7th Cir. 2012). A court may require a party to post a bond if there is reason to believe that it would be difficult for a prevailing party to collect its costs. *Gay*, 682 F.3d at 594. "Factors generally considered are 1) the merits of the case, 2) the prejudice to the defendant of not requiring a bond, and 3) the prejudice to the plaintiff of requiring a bond." *Malibu Media, LLC v. Tashiro*, No. 1:13-cv-00205-WTL-MJD, 2013 U.S. Dist. LEXIS 137025, at *1–2 (S.D. Ind. Sept. 25, 2013). In considering the merits of the case, the Seventh Circuit upheld a district court's requirement of plaintiff to post a bond due, in part, to the frivolous nature of the suit. *See generally Anderson*, 998 F.2d at 496 ("The apparently frivolous character of this litigation and the fact that the plaintiff is an unrepresented individual made the defendants' motion for the

various other staff behind the scenes, were forced to investigate Plaintiff's activities on the evening of February 13, 2023 into the morning of February 14, 2023, not only to respond properly to Plaintiff's motion, but also to rebut the baseless allegations that Plaintiff made against them personally.

Plaintiff must understand that one cannot lodge accusations such as these without any legitimate basis. Plaintiff had no valid reason to believe that Defendants or defense counsel had any involvement in causing Plaintiff's injuries. But that did not deter him from barging into Court and making those accusations. That was unacceptable and an abuse of the judicial forum.

## 4. CONCLUSION

Sir Walter Scott said, "[o]h what a tangled web we weave when first we practice to deceive." Plaintiff's accusations have been exposed as patently false. This litigation has gone on for far too long, particularly with respect to Plaintiff's baseless allegations of perjury, evidence tampering, and attorney misconduct. Thus far, the only individual who has been shown to engage in misconduct and proffer falsities in the courtroom is Plaintiff. Plaintiff accuses the Court of endangering his safety, but the evidence of what actually transpired on February 13 and 14, 2023 more than amply demonstrates that the only one who presents a risk to Plaintiff's safety is Plaintiff himself. For these reasons, the Court will again deny

---

posting of such a bond at least a plausible one . . . ."). Plaintiff's behavior in this case, together with his out-of-state residence, his pro se status, and the frivolous nature of the suit, gives the Court ample reason to suspect that imposition of a bond is appropriate here, and there is no indication that Plaintiff would be prejudiced thereby.

Plaintiff's motion for a mistrial, and it will also deny his purported motion for leave to appeal in forma pauperis.[11]

Accordingly,

**IT IS ORDERED** that Plaintiff's motion for mistrial, ECF No. 59, be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Defendants' motion for sanctions, ECF No. 66, be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Defendants' second motion for sanctions, ECF No. 67, be and the same is hereby **GRANTED in part and DENIED in part**;

**IT IS FURTHER ORDERED** that Plaintiff be and the same is hereby **ORDERED** to pay to the Clerk of the Court as a sanction the full cost of having empaneled the jury for trial in this matter, which cost amounts to **$1,118.18**;

**IT IS FURTHER ORDERED** that Plaintiff be and the same is hereby **ORDERED** to reimburse defense counsel for their reasonable attorneys' fees and costs associated with responding to Plaintiff's motion for mistrial, ECF No. 59; Defendants shall **FILE** on the docket a record of their reasonable attorneys' fees and costs in preparing such response on or before **June 28, 2023**;

**IT IS FURTHER ORDERED** that Defendants City of West Allis and Chief Patrick Mitchell stand **DISMISSED** from this action;

**IT IS FURTHER ORDERED** that Plaintiff's motion for leave to appeal in forma pauperis, ECF No. 69, be and the same is hereby **DENIED**;

---

[11]Although the filing is captioned as a motion for leave to appeal in forma pauperis, the substance of the one-page filing is just to provide notice of anticipated appeal.

Case 2:19-cv-00996-JPS    Filed 06/14/23    Page 41 of 42    Document 73

**IT IS FURTHER ORDERED** that in accordance with the jury's special verdict, ECF No. 61, this action be and the same is hereby **DISMISSED with prejudice**, together with the Defendants' costs as may be taxed by the Clerk of the Court; and

**IT IS FURTHER ORDERED** that should Plaintiff elect to file an appeal in this matter, Plaintiff is ordered to post a bond or the cash equivalent for the reasonable attorneys' fees and costs incurred by defense counsel in responding to Plaintiff's motion for mistrial, ECF No. 59; the cost of having empaneled the jury; and Defendants' costs in this action as may be taxed by the Clerk of the Court.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 14th day of June 2023.

BY THE COURT:

_____

J. P. Stadtmueller
U.S. District Judge